IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IMMERSION CORPORATION, | ) ) ) |
| Plaintiff, | ) ) C.A. No. 12-259-RGA |
| v. | ) ) ) REDACTED PUBLIC VERSION |
| HTC CORPORATION and HTC AMERICA, INC., | ) ) ) |
| Defendants. | ) ) ) |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF JAMES PAMPINELLA**

ASHBY & GEDDES
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*

*Of Counsel:*

John P. Schnurer
Michael J. Engle
Ryan B. Hawkins
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, CA  92130-2594
(858) 720-5700

Ryan McBrayer
Jonathan Putman
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
(206) 359-8000

Terrence J. Wikberg
Brandon M. White
PERKINS COIE LLP
700 Thirteenth Street N.W.
Washington, D.C. 20005
(202) 654-6200

Cheng C. Ko
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 351-8000

Dated: October 3, 2014

Terrence J. Wikberg
Brandon M. White
PERKINS COIE LLP
700 Thirteenth Street N.W.
Washington, D.C. 20005
(202) 654-6200

Cheng C. Ko
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 351-8000

Dated: October 3, 2014

## TABLE OF CONTENTS

                                                                                                                                                  Page

I. [REDACTED] ......................................................................... 2

II. MR. PAMPINELLA'S ENTIRE REASONABLE ROYALTY OPINION IS UNRELIABLE BECAUSE HE HAS NO BASIS TO ASSUME THE ASSERTED PATENTS ARE THE MOST VALUABLE AMONG THE MANY PATENTS IN IMMERSION'S PORTFOLIO ................................................................ 3

III. MR. PAMPINELLA'S ENTIRE REASONABLE ROYALTY OPINION IS UNRELIABLE BECAUSE [REDACTED] INSTEAD OF PROPERLY ASSESSING THE ENTIRE VALUE OF THE MOTOROLA PORTFOLIO LICENSE ............................................................... 7

IV. MR. PAMPINELLA'S BACKUP LOST PROFITS OPINION VIOLATES BASIC FEDERAL CIRCUIT LAW ............................................................................. 9

V. CONCLUSION ................................................................................................ 11

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*AVM Techs. v. Intel Corp.*,
 927 F. Supp. 2d 139 (D. Del. 2013) ..................................................................................... 8

*Eng'red Prods. Co. v. Donaldson Co., Inc.*,
 147 Fed. App'x 979 (Fed. Cir. 2005) ............................................................................ 10, 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012) ..................................................................................... 4, 7, 8, 9

*Oracle Am., Inc. v. Google Inc.*,
 C 10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ........................................ 5

*Oracle Am., Inc. v. Google Inc.*,
 No. C 10-03561 WHA, 2011 WL 6055505 (N.D. Cal. Dec. 6, 2011) .............................. 5, 6

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
 575 F.2d 1152 (6th Cir. 1978) ........................................................................................ 10, 11

*Riles v. Shell Exploration & Prod. Co.*,
 298 F.3d 1302 (Fed. Cir. 2002) ........................................................................................... 12

*Versata Software, Inc. v. SAP Am., Inc.*,
 717 F.3d 1255 (Fed. Cir. 2013) cert. denied, 134 S. Ct. 1013, 187 L. Ed. 2d 851 (U.S.
 2014) ................................................................................................................................... 12

**OTHER AUTHORITIES**

Fed. R. Civ. P. 702 ................................................................................................................ 5, 9, 12

The proffered testimony of Immersion's damages expert, James Pampinella, is speculative, based upon unsound methods, and inadmissible.

Mr. Pampinella calculates his reasonable royalty by "apportioning" the value of 400+ U.S. patents licensed in Immersion's litigation settlement agreement to an amount attributable to the asserted patents, based entirely on an assumption that the five asserted patents are "the most valuable" five among the 400+.  But Mr. Pampinella has not read, let alone analyzed the value of those 400+ patents.  He has no basis to opine that these five patents are more valuable than the others he has never seen. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

Mr. Pampinella also fails to consider the entire value of the Motorola Portfolio License. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

Finally, Mr. Pampinella backstops his erroneous reasonable royalty opinion with an equally inadmissible lost profits theory.  His lost profits theory is speculative and violates bedrock Federal Grant law regarding the foundation for such a theory.  It too is inadmissible.

For these reasons, Mr. Pampinella's reasonable royalty testimony should be precluded in its entirety, and Mr. Pampinella's lost profits testimony should be precluded.

I. ███████████

As a threshold matter, the Court should understand the Motorola Portfolio License because Mr. Pampinella's first two inadmissible opinions flow from it. In late 2012, Immersion and Motorola reached a settlement agreement ███████████

███████████



## II. Mr. Pampinella's Entire Reasonable Royalty Opinion Is Unreliable Because He Has No Basis to Assume the Asserted Patents Are the Most Valuable Among the Many Patents in Immersion's Portfolio

Mr. Pampinella's entire opinion is based on a foundational and inaccurate assumption. He looks to the Motorola Portfolio License—which covers Immersion's entire mobility portfolio—seeking to "allocate" a portion of its value to the five patents-in-suit.[9] Yet, Mr. Pampinella has never compared the asserted patents to any of the other patents in the portfolio, and has no personal opinion regarding the relative value of the patents-in-suit:

> Q: Do you have any basis to yourself believe that the five patents at issue are the most valuable within Immersion's portfolio?
>
> A: No. I can't say that I have assessed whether they are the most valuable or not independently.[10]

His report does not analyze the other patents covered under the License to support his conclusion that they are less valuable.



---

[7]

[8] *Id.*

[9] Ex. 3, Pampinella Report at 43 (noting that the Motorola Portfolio License must be "apportioned . . . in order isolate the value attributable to the patents-in-suit")

[10] Ex. 4, Pampinella Depo. at 8:25–9:24.

[11] Ex. 4, Pampinella Depo. at 9:25–10:11; 13:18–14:19.

███.[12] He then relied on a study from the AIPLA that suggests that the top 5% most valuable patents in any patent portfolio account for 43.8% of the portfolio's overall value,[13] to conclude via simple math that the five asserted patents account for 43.8% ██████████████████████████████████████████████████████ However, because the AIPLA's rationale applies only to the top 5% most valuable patents in a given portfolio, Mr. Pampinella's entire opinion rests on the assumption that the five patents-in-suit are *the* most valuable 5% among 400+ patents he never looked at.

████████████████████████████████████████████████████████████████████████████████████████[14] As such, the necessary predicate steps before allocating value to specific patents using the AIPLA study include (a) determining which patents are covered under the License, i.e., ████████████████████████████████████████████, and (b) ranking those patents based upon how valuable of a contribution each has made to the mobility field (because a valid, ranked order of every patent was an assumption of the AIPLA study). Yet Mr. Pampinella willingly admits that he never performed either of these steps.[15] This fact alone renders his opinion baseless and unreliable.[16] Indeed, it is black-letter law that "[a] damages theory must be based on 'sound economic and factual predicates.'"[17] Of the many generally-accepted approaches for valuing patents—cost approach, market approach, the income approach, the *Georgia-Pacific* factors—none permit an expert to rely upon ████████████ as the sole predicate basis for analyzing the value of patents.

---

[12] Ex. 3, Pampinella Report at 34, n.197; 38, n.218.
[13] *Id.* at 36–37.
[14] ████████████████████████████████████████████████████████████████████████████████
[15] Ex. 4, Pampinella Depo. at 9:8–24; 13:18–14:19.
[16] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)).
[17] *Id.*

Furthermore, even assuming *arguendo* that expert testimony from ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ could suffice as factual basis for his patent valuation (even though no such testimony was disclosed here), Mr. Pampinella's opinion is nevertheless inadmissible because he fails in this instance to reveal his sources' valuation methodology. Rather, he simply cites to undisclosed "discussions,"[18] depriving HTC of a chance to test their conclusions. As such, his opinion is also inadmissible because it cannot be "reasonably . . . assessed for reliability."[19]

Indeed, Courts have rejected expert opinions for similar foundational defects surrounding the same AIPLA study. For instance, in the recent case *Oracle America, Inc., v. Google, Inc.*, Oracle's expert calculated his reasonable royalty by apportioning a $100 million draft agreement the parties had discussed in 2006.[20] After the expert opined that 30% of the 2006 agreement's value was attributable to the patents-in-suit, Google challenged the apportionment as baseless because the expert "admittedly did not analyze the rest of the license bundle that made up the $100 million starting value."[21] Like Mr. Pampinella, the expert in *Oracle* admitted that "he had no specific information about what Google would have received under the contemplated partnership besides licenses to the [patents-in-suit]."[22] The court struck the expert's opinion because it found that he "apportioned the purchase price of a broad license portfolio without any basis to opine on the value of the rest of that license portfolio."[23]

Notably, when given an opportunity to revise his opinion, the expert apportioned the same $100 million agreement using the AIPLA study's ranked-order methodology.[24] The court allowed the revised apportionment, but only after the expert resolved his prior lack of proof

---

[18] Ex. 3, Pampinella Report at 34, n.197; 38, n.218.
[19] Fed. R. Civ. P. 702, Advisory Committee Notes, 2000 Amendment (citing *Daubert*, 509 U.S. 593).
[20] Ex. 5, *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 6055505, at *3, *5 (N.D. Cal. Dec. 6, 2011).
[21] *Id.* at *5
[22] *Id.*
[23] *Id.* at *6 (emphasis removed).
[24] Ex. 6, *Oracle Am., Inc. v. Google Inc.*, C 10-03561 WHA, 2012 WL 850705, at *2 (N.D. Cal. Mar. 13, 2012).

regarding the relative value of the patents-in-suit by organizing a "team of Oracle engineers" to "evaluate[] the Sun patents that would have been included in the [2006 agreement] and rank[] those patents based on expected technical contribution to a smartphone platform."[25] The engineers submitted declarations explaining their precise ranking methodology, which included steps such as: (1) "creat[ing] a list of over 1300 patents issued to Sun prior to June 30, 2006" which might have been covered under the 2006 agreement; (2) separately reviewing "the titles, abstracts, inventors, application dates, and where necessary, the specifications and claims," of each of these 1300 patents, to determine "569 relevant patents that would have been included in the [licensed] bundle;" (3) dividing those 569 Oracle patents into "22 technology groups," which they had pre-ranked according to their importance to various aspects of mobility technology, e.g., "startup time, speed, memory and security;" (4) separately "rat[ing] the importance of each of the 569 patents on a three-point scale ('1' being most valuable), within each technology group, based on the patented functionality's expected contribution to a smartphone platform's startup, speed, or footprint;" and finally, (5) counting the number of patents which had a "1" rating, and concluding that those 22 patents were the "most valuable" patents in Sun's Java mobile patent portfolio in 2006.[26]

     Mr. Pampinella does nothing like this. ███████████████████████████

███████████████████████████████████████████████████████████████

███ As such, Mr. Pampinella's opinion lacks sufficient factual basis, is untestable, and must be excluded.

---

[25] *Id.*
[26] *Id.* at *2–3.

### III. Mr. Pampinella's Entire Reasonable Royalty Opinion Is Unreliable Because He █████████████████████████████████████

The second problem with Mr. Pampinella's report is that he based his opinion entirely on ███████████████████████████████████████████████████████████ This violates *LaserDynamics, Inc. v. Quanta Computer, Inc.*, where the Federal Circuit prohibited cherry-picking from litigation settlement licenses, and specifically required experts to evaluate such licenses in their "proper context" in order to account for the reality that "license fees . . . are tainted by the coercive environment of patent litigation."[27]

Specifically, Mr. Pampinella looks only to the █████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████

Mr. Pampinella conveniently ignores the ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ She thus examined the entire agreement and based her opinion on its overall value, the full list of rights granted, and the circumstances of the agreement.[30] In reply, Mr. Pampinella simply reaffirmed his original position by stating ███████████████████████████

---

[27] *LaserDynamics*, 694 F.3d at 77.
[28] Ex. 3, Pampinella Report at 33.
[29] ███████████████████████████████████████████████████████████ 34, n.127.
[30] Ex. 7, Stamm Report at 34; *c.f. LaserDynamics*, 694 F.3d at 77.

[31] Likewise, at his deposition, Mr. Pampinella testified that he understood that ▮▮▮▮▮▮[32] And, when asked directly during his deposition whether ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮,"[33]

*Daubert* and *LaserDynamics* forbid this type of cherry-picking. No license agreement can be the basis for a royalty opinion if its terms and circumstances—all of them—are analyzed and viewed in their "proper context,"[34] which in this case, ▮▮▮▮▮▮ ▮▮▮▮▮▮ Indeed, in *AVM Technologies v. Intel Corp.*, this Court rejected similar reasoning as "completely speculative," explaining that:

> [w]ithout analysis of the litigation, the conclusion cannot be based on "sound economic and factual predicates." . . . For example, what was the amount of damages ultimately sought in the litigation? Would the issue of willfulness have been tried, with the possibility of treble damages? Or, as in *LaserDynamics, Inc. v. Quanta Computer*, Inc., had sanctions been imposed?[35]

This Court held, as the Federal Circuit had, that an expert must account for the whole story of the license. Mr. Pampinella does not do that, and should be excluded.

The facts Mr. Pampinella ignores also contradict his conclusions, which only emphasizes that his opinion is unreliably detached from the whole story of the Motorola Portfolio License. ▮▮▮▮▮▮ ▮▮▮▮▮▮

---

[31] Ex. 8, Pampinella Reply Report at 11.
[32] Ex. 4, Pampinella Depo at 63:16–64:9.
[33] *Id.* at 75:12–19.
[34] *LaserDynamics*, 694 F.3d at 77.
[35] *AVM Techs. v. Intel Corp.*, 927 F. Supp. 2d 139, 143 (D. Del. 2013) (citing *Riles*, 298 F.3d at 1311).



In sum, Mr. Pampinella's reasonable royalty analysis is speculative and inadmissible because he fails to consider the entire value of the Motorola Portfolio License. As such, and because the Motorola License is the sole basis for his reasonable royalty baseline, Mr. Pampinella's entire reasonable royalty opinion must be precluded under Rule 702.

### IV. Mr. Pampinella's Backup Lost Profits Opinion Violates Basic Federal Circuit Law

In addition to his flawed reasonable royalty analysis, Mr. Pampinella sets forth two alternative, non-additive lost profits theories.[39] One of these theories posits that but-for its alleged infringement, HTC would have had no choice but to license Immersion's TouchSense

---

[38] *See LaserDynamics*, 694 F.3d at 77.
[39] Ex. 3, Pampinella Report at 11–12. Although HTC only challenges one of these lost profits theories here, it does not necessarily concede the admissibility or legitimacy of the second theory.

software.[40] That is, Mr. Pampinella believes HTC would have been (and should now be) compelled to purchase a product (TouchSense) that is not patented *in addition to* a license.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████.

The fundamental problem with Mr. Pampinella's premise is that HTC never signed a software license for TouchSense, ████████████████████████████. As such, Mr. Pampinella's entire lost profits theory is founded entirely upon his best guess as to what an Immersion/HTC TouchSense software license might have looked like, if one had been executed in 2011. He then awards Immersion "lost profits" in the form of the software royalties it supposedly would have collected under that imaginary license.[41] However, whereas a damages expert may hypothesize about non-existent licenses in the context of his reasonable royalty analysis, lost profits awards must be based upon hard facts rather than speculative evidence.[42]

For instance, under *Panduit Corp. v. Stahlin Bros. Fibre Works*,[43] the patentee seeking lost profits must set forth factual evidence to prove factors that include "demand for the patented product."[44] Mr. Pampinella has no evidence of this. First, his opinion here is based on an *unpatented* product. Second, he speculates that HTC had demand for TouchSense because (a) it sells phones with haptic technology and (b) the parties once discussed a potential TouchSense

---

[40] "TouchSense" is Immersion's trademarked software suite that it licenses to mobile device manufacturers, who in turn can use the software to provide haptic feedback in their devices.
[41] Ex. 3, Pampinella Report at 14 ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████████
[42] *See Eng'red Prods. Co. v. Donaldson Co., Inc.*, 147 Fed. App'x 979, 990 (Fed. Cir. 2005) (finding plaintiff's evidence of lost profits evidence "too speculative" where there was no direct evidence that the company with whom plaintiff had signed new contract knew he had been forced to lower his price due to competition with alleged infringer).
[43] 575 F.2d 1152, 1156 (6th Cir. 1978). Mr. Pampinella applies the *Panduit* test in his lost profits analysis. *See* Ex. 3, Pampinella Report at 13–14.
[44] *Panduit*, 575 F.2d at 1156.

license.[45]  And in any event, this evidence cannot support a finding that HTC *as a corporation* had demand for TouchSense. It can only show possible interest by certain of HTC's lower-level employees. Mr. Pampinella can only speculate as to whether HTC's actual decision-makers (i.e., the people who actually bind the corporation and sign the checks) have ever heard the word "TouchSense," much less demanded it as a product. His opinion thus lacks basic foundation required under the law of lost profits.

Mr. Pampinella likewise offers only speculation in regarding the fourth *Panduit* factor, which requires evidence establishing the "amount of lost profits [Immersion] would have made" absent the alleged infringement.[46] For his calculation, Mr. Pampinella simply applies a ▬▬▬[47] But again, no such license has ever existed, outside of Mr. Pampinella's imagination. Even assuming *arguendo* that such a license would have been signed, Mr. Pampinella can only speculate as to what the royalty rate would have been. This is improper basis for a lost profits award.[48]

Finally, as a legal matter, Mr. Pampinella's reasoning turns the concept of lost profits on its head. It is black-letter law that a patentee cannot collect lost profits tied to the infringer's sales unless it can prove a reasonable probability that, "'but for' the infringement, it would have

---

[45] *See* Ex. 3, Pampinella Report at 21 (emphasis added).
[46] *Panduit*, 575 F.2d at 1156.
[47] Ex. 3, Pampinella Report at 21–22.
[48] *See Eng'red Prods.*, 147 Fed. App'x at 990 (finding plaintiff's evidence of lost profits evidence "too speculative" where there was no direct evidence that the company with whom plaintiff had signed new contract knew he had been forced to lower his price due to competition with alleged infringer).

made the sales that were made by [the infringer]."[49] HTC makes and sells mobile devices, whereas Immersion sells licenses to haptic software and patents—neither party competes in the other's marketplace. As such, they could not possibly have made one another's sales, and lost profits are a legal impossibility.

In sum, Mr. Pampinella's lost profits theory lacks the required foundation and the "sound economic and factual predicates" necessary for admissibility under Rule 702.[50] As such, this lost profits theory should be precluded.

## V. Conclusion

For the reasons outlined above, Mr. Pampinella's reasonable royalty testimony, and one of his lost profits theories should be excluded.

|  |  |
|---|---|
| | ASHBY & GEDDES |
| *Of Counsel:* | */s/ Tiffany Geyer Lydon* |
| John P. Schnurer | John G. Day (#2403) |
| Michael J. Engle | Tiffany Geyer Lydon (#3950) |
| Ryan B. Hawkins | 500 Delaware Avenue, 8th Floor |
| PERKINS COIE LLP | P.O. Box 1150 |
| 11988 El Camino Real | Wilmington, DE 19899 |
| Suite 350 | (302) 654-1888 |
| San Diego, CA 92130-2594 | jday@ashby-geddes.com |
| (858) 720-5700 | tlydon@ashby-geddes.com |
| | |
| Ryan McBrayer | *Attorneys for Defendants* |
| Sher S. Kung | |
| PERKINS COIE LLP | |
| 1201 Third Avenue, Suite 4900 | |
| Seattle, WA 98101 | |
| (206) 359-8000 | |

---

[49] *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263–64 (Fed. Cir. 2013) cert. denied, 134 S. Ct. 1013, 187 L. Ed. 2d 851 (U.S. 2014) (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc)).
[50] *See Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

Terrence J. Wikberg
Brandon M. White
PERKINS COIE LLP
700 Thirteenth Street N.W.
Washington, D.C. 20005
(202) 654-6200

Cheng C. Ko
PERKINS COIE LLP
2901 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
(602) 351-8000

Dated:  October 3, 2014