# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IMMERSION CORPORATION, | ) | |
| | ) | C.A. No. 12-259-RGA |
| Plaintiff, | ) | |
| | ) | **PUBLIC VERSION** |
| v. | ) | |
| | ) | |
| HTC CORPORATION and HTC AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF IMMERSION'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF JAMES PAMPINELLA

OF COUNSEL:

Bryan Wilson
Marc Peters
Michael Kryston
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 813-5600

Harold J. McElhinny
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Tel: (415) 268-7000

Dated: October 24, 2014
Public Version Dated: November 4, 2014
1170109 / 41933

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Plaintiff Immersion Corporation*

# TABLE OF CONTENTS

Page

I.      FACTUAL BACKGROUND ........................................................................ 1

II.     STANDARD OF REVIEW ......................................................................... 4

III.    MR. PAMPINELLA'S ANALYSIS OF THE MOTOROLA LICENSE
        ROYALTY RATE IS THOROUGH AND SOUND ................................... 5

        A.      ████████████████████████████████████
                ............................................................................................ 5

        B.      HTC's Argument Finds No Support in the Law .............................. 8

IV.     RELIABLE EVIDENCE SHOWS THAT THE PATENTS-IN-SUIT ARE
        IMMERSION'S KEY PATENTS .............................................................. 10

V.      MR. PAMPINELLA PROPERLY CONCLUDES THAT HTC'S
        INFRINGEMENT IS THE "BUT-FOR" CAUSE OF LOST PROFITS TO
        IMMERSION ............................................................................................. 15

        A.      There is Sufficient Evidence of Demand For the Immersion Product ................. 16

        B.      There is Sufficient Evidence of the Amount of Immersion's Lost Profits .......... 18

        C.      HTC's Infringement Was the But-For Cause of Lost Profits to Immersion ........ 18

VI.     CONCLUSION ......................................................................................... 19

TABLE OF AUTHORITIES

**Page(s)**

CASES

*ActiveVideo Networks, Inc. v. Verison Commc'n, Inc.,*
   694 F.3d 1312 (Fed. Cir. 2012) ............................................................4, 10, 18

*Am. Seating Co. v. USSC Grp., Inc.,*
   514 F.3d 1262 (Fed. Cir. 2008) .......................................................................16

*Apple Inc. v. Motorola, Inc.,*
   757 F.3d 1286 (Fed. Cir. 2014) ................................................................ *passim*

*AVM Techs., LLC v. Intel Corp.,*
   927 F. Supp. 2d 139 (D. Del. 2013) ..............................................................9, 10

*Children's Broad. Corp. v. Walt Disney Co.,*
   357 F.3d 860 (8th Cir. 2004) ..........................................................................11

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ..........................................................................................4

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
   185 F.3d 1341 (Fed. Cir. 1999) ...................................................................15, 19

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010), *aff'd on other grounds,*
   131 S. Ct. 2238 (2011) .......................................................................................4

*King Instruments Corp. v. Perego,*
   65 F.3d 941 (Fed. Cir. 1995) .......................................................................16, 17

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
   684 F.3d 51 (Fed. Cir. 2012) ..........................................................................8, 9

*Lightning Lube, Inc. v. Witco Corp.,*
   4 F.3d 1153 (3d Cir. 1993) ..............................................................................11

*Micro Chem., Inc. v. Lextron, Inc.,*
   317 F.3d 1387 (Fed. Cir. 2003) ........................................................................4

*Oracle Am. Inc. v. Google, Inc.,*
   No. C-10-03561 WHA, 2011 WL 6055505 (N.D. Cal. Dec. 6, 2011) ...................14

*Oracle Am. Inc. v. Google, Inc.*
   No. C-10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ...................14

## TABLE OF AUTHORITIES
### (continued)

Page

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010).................................................................................8

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995)...............................................................................16

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
   883 F.2d 1573 (Fed. Cir. 1989).......................................................................15, 16

*Stevens v. Cessna Aircraft Co.*,
   634 F. Supp. 137 (E.D. Pa. 1986), *aff'd without opinion*,
   806 F.2d 252 (3d Cir. 1986)..................................................................................11

*Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*,
   320 F.3d 1213 (11th Cir. 2003) ............................................................................11

*United States Fire Ins. Co. v. Kelman Bottles, LLC*,
   No. 11cv089, 2014 U.S. Dist. LEXIS 109982 (W.D. Pa. Aug. 8, 2014) ...............11

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013)...........................................................15, 17, 18, 19

## OTHER AUTHORITIES

Fed. R. Evid. 403 ......................................................................................................8

Fed. R. Evid. 702 .................................................................................................4, 10

Fed. R. Evid. 703 ...............................................................................................11, 13

4 Weinstein's Federal Evidence § 701.03.................................................................11

Defendants' Motion to Exclude the Testimony of James Pampinella (D.I. 237) (the "Motion") amounts to no more than a disagreement over how the jury should view a few pieces of evidence in this case. HTC Corporation and HTC America (together, "HTC") provide no basis to doubt the soundness of Mr. Pampinella's economic methodology. HTC does not dispute that Mr. Pampinella considered the potentially relevant license agreements in reaching his opinion on a reasonable royalty, including a license to Motorola that HTC's own damages expert agrees is informative to this dispute. Instead, HTC presents the Court with fragments of Mr. Pampinella's reports, ignores the extensive and well-reasoned analysis he provided, and launches purportedly factual attacks that are both contrary to the record and insufficient as a matter of law. HTC's Motion seeks to improperly supplant the role of the jury, and it must be denied.

## I.   FACTUAL BACKGROUND

HTC's Motion fails to provide any context for its objections, or even to provide the Court with the complete opinions to which it objects. The Motion provides the Court with only narrow excerpts of Mr. Pampinella's opening report, only a few excerpts of Mr. Pampinella's deposition, and only a *single page* of Mr. Pampinella's reply report. (Motion Exs. 3, 4, 8.) The Motion completely ignores the robust economic analysis offered by Mr. Pampinella. Indeed, a reader of HTC's Motion without access to the full record would think that Mr. Pampinella did nothing to support his analysis, when in fact he did quite a lot. HTC's motion should be evaluated in light of the full record, not HTC's truncated version of the facts.

In order to explore the damages issues in this case, it is first helpful to understand the nature of Immersion's business. Immersion is the leading developer of haptics solutions for a variety of electronic products, including game consoles, navigation systems, and portable devices, such as cell phones, smart phones, and tablets. This case concerns five of Immersion's patents that cover haptics technology used in many phones and tablets that use the Android

operating system. Immersion's software that implements this technology is used in more than 200 million phones worldwide. Companies that use Immersion's software receive an implied license to Immersion's patent portfolio, including the patents-in-suit. Immersion has also licensed companies, including Motorola, for devices that do not use Immersion's software but do practice Immersion's patents. Prior to commencing this litigation, Immersion offered a license to HTC and engaged in months of negotiation with HTC over a software license. HTC decided to continue selling its products without taking a license from Immersion. (*See* Declaration of James Pampinella ("Pampinella Decl.") Ex. A,[1] Pampinella Expert Report ¶ 27.)

Counsel for Immersion retained Mr. Pampinella to provide an opinion on the damages suffered by Immersion as a result of HTC's infringement of the patents-in-suit. Mr. Pampinella offers opinions on three basic categories of damages: (1) the reasonable royalty payments owed by HTC; (2) Immersion's lost profits as compared to a world where HTC avoided infringement by entering into a software license with Immersion; and (3) Immersion's lost profits as compared to a world where HTC avoided infringement by leaving the market. (*Id.* ¶ 24.)

Mr. Pampinella's reasonable royalty opinion is based on a standard, well-reasoned damages analysis that applies each of the fifteen *Georgia Pacific* factors to determine the rate that Immersion and HTC would have reached in a hypothetical negotiation. Mr. Pampinella, like HTC's damages expert Ms. Stamm, informs his *Georgia Pacific* analysis with a market approach methodology that considers a number of patent licenses previously entered into by Immersion and HTC. (*See id.* ¶¶ 58-73; Ex. A, Stamm Rebuttal Expert Report ¶¶ 64-157.) Neither HTC nor its expert disputes that this is the proper methodology for determining a reasonable royalty.

---

[1] Exhibits to the brief ("Ex. __") are located in the Appendix filed contemporaneously herewith.

As one component of his broader analysis, Mr. Pampinella considers the patent license between Immersion and Motorola as particularly relevant. So too did HTC's expert, who agrees that the Motorola license "is informative to the hypothetical negotiation." (Ex. A, Stamm Rebuttal Expert Report Rept. ¶ 77.) Indeed, the factual similarities between the Motorola license and a hypothetical HTC negotiation are striking. Both Motorola and HTC are large Android handset manufacturers. Both Motorola and HTC were approached about a license in the same time frame. Neither Motorola nor HTC had an ongoing business relationship with Immersion. Motorola negotiated a patent-only license, which included the patents-in-suit. Based on the relevance of the license to this case, Mr. Pampinella applies standard valuation methodologies to assess the differences between the Motorola license and a license hypothetically negotiated by HTC and Immersion. (Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 71-86.) These methodologies included applying the American Intellectual Property Law Association's 2002 paper, "A Study of Patent Mortality Rates: Using Statistical Survival Analysis to Rate and Value Patent Assets." (*See id.* ¶¶ 76-86.) Mr. Pampinella's reasonable royalty analysis is based upon reliable facts, reliably applied through accepted economic methodologies.

Mr. Pampinella's lost profits analyses are likewise based upon sound economic methodology. Mr. Pampinella considers alternate scenarios, one in which HTC had not infringed by virtue of entering into a TouchSense agreement with Immersion (termed "HTC as Licensee") and one in which HTC had not infringed because it left the market. HTC's Motion challenges only the HTC as Licensee scenario, but it cannot overcome the clear evidence of demand for Immersion's technology from HTC and other major companies, and is unable to counter Mr. Pampinella's analysis of licensing rates actually exchanged between HTC and Immersion. (*See*

Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 32-38, 43-51; Pampinella Decl. Ex. B,

Pampinella Reply Expert Report ¶¶ 55, 59.)

All of this is described in detail in Mr. Pampinella's opening report, his reply report, and

his deposition, including the substantial portions that HTC omitted from the exhibits filed with

its Motion.

## II.     STANDARD OF REVIEW

Expert testimony is admissible under Federal Rule of Evidence 702 if it "rests on a

reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. at 597 (1993).  "When the methodology is sound, and the

evidence relied upon sufficiently related to the case at hand, disputes about the degree of

relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not

its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*

*on other grounds*, 131 S. Ct. 2238 (2011); *see also ActiveVideo Networks, Inc. v. Verizon*

*Commc'n, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (disagreements with the factual

assumptions and considerations underlying an expert's conclusions go to weight, not

admissibility).

While the Court serves as the gatekeeper for expert testimony, "[a] judge must be

cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of

conclusions, impose its own preferred methodology, or judge credibility, including the credibility

of one expert over another.  These tasks are solely reserved for the fact finder."  *Apple Inc. v.*

*Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) (citing *Smith v. Ford Motor Co.*, 215 F.3d

713, 718 (7th Cir. 2000)); *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed.

Cir. 2003) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role

of the trial court to evaluate the correctness of facts underlying one expert's testimony.").  This is

particularly the case for damages experts, where "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'" *Apple*, 757 F.3d at 1315 (quoting *i4i Ltd.*, 598 F.3d at 856).

## III.   MR. PAMPINELLA'S ANALYSIS OF THE MOTOROLA LICENSE ROYALTY RATE IS THOROUGH AND SOUND

HTC's Motion does not question the accuracy of Mr. Pampinella's calculations, the reliability of his economic methodology, or his faithful application of the *Georgia Pacific* factors. Neither HTC nor its damages expert disputes that the jury can properly consider the Motorola license. Instead, HTC asks this Court to exclude Mr. Pampinella's entire reasonable royalty opinion based on HTC's assumptions about the Motorola negotiation, in which HTC was never involved. (Motion at 2, 7-9.) HTC's assumptions are contradicted by the testimony of Immersion's Chief Financial Officer, Paul Norris, who personally participated in the Motorola license negotiations, and finds no support in the law.



**A.**  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HTC first argues that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is not correct. As Mr. Norris explained at his deposition, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. B, Norris Dep. Tr. at 107:22-23.) testimony does not reflect that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In fact, his testimony reflects that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮t. Mr. Norris likewise explained that▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Had HTC's counsel further inquired, which they did not, Mr. Norris would have told them what he told Mr. Pampinella: ████████████████████████████ ████████████████████████████████████████. (Declaration of Paul Norris ("Norris Decl.") ¶ 8; Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 25.) Only the International Trade Commission (ITC) case with Motorola was active at the time of the negotiation. The ITC does not have the ability to award past damages, so ████████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████ (*Id.*) As such, ████████████████████████ ██████████████████ (Pampinella Decl. Ex. C, Pampinella Dep. Tr. at 64:16-17.) During the negotiation with Motorola, Immersion in fact consistently communicated that ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. (Norris Decl. ¶ 10.) To this end, the Motorola negotiations focused on ████████████████████████████ ████████████████████████████████████████ ████████████████████████ (*Id.*)

Immersion's revenue recognition and accounting practices likewise reflect the difference ████████████████████████████████████████ ████████████████████████████████████████

▇▇▇▇▇▇▇▇▇▇▇ (Norris Decl. ¶ 9.)  HTC's insistence that a reasonable per-unit royalty

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[2]

Moreover, Mr. Pampinella *does* consider ▇▇▇▇▇▇▇▇▇ that HTC accuses him of

"ignor[ing]." (*Compare* Motion at 7.)  Rather than addressing Mr. Pampinella's analysis head-

on, HTC's Motion simply omits the portions of Mr. Pampinella's opinions discussing why▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  As explained in a section of Mr. Pampinella's

reply report that was not included with the Motion, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

(Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 27; *see also* Pampinella Decl. Ex. A,

Pampinella Expert Report ¶¶ 72-73.)  These considerations include the fact that the Motorola

license came shortly after Google's acquisition of Motorola, at a time when the parties wanted to

quickly resolve past disputes.  (Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 27.)

Likewise, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇.  (*Id.* ¶ 27.)  And, significantly, ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ (*Id.* ¶ 29.)  As Mr. Pampinella explained at his deposition, it is

"completely inappropriate" to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ (Pampinella Decl. Ex. C, Pampinella Dep. Tr. at 63:24-64:3.)

---

[2] HTC's Motion cites to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

If anything, a reasonable jury is likely to view 

(*See* Pampinella Decl. Ex. A, Pampinella Expert Report ¶ 36.)

### B.   HTC's Argument Finds No Support in the Law

Because HTC's view of the Motorola license lacks factual support, it cannot form a basis for excluding Mr. Pampinella's testimony.  Even assuming, for the sake of argument, that HTC's position had factual merit, it still would not be sufficient to exclude his expert testimony because HTC's argument is unsupported by the law.  Ironically, given its accusations of "cherry-picking" in Mr. Pampinella's report, HTC presents quotes from *LaserDynamics* out of context and for propositions not advanced by the Federal Circuit.  The portion of *LaserDynamics* relied upon by HTC for placing licenses in their "proper context" involved a motion *in limine* under Federal Rule of Evidence 403 to exclude a settlement agreement and license in its entirety. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67, 77 (Fed. Cir. 2012).

Here, there is no dispute in HTC's Motion or otherwise that the Motorola license, despite being part of a settlement package, is reliable and appropriately used in calculating a reasonable royalty to the asserted patents.  *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (noting that the most reliable license in that case arose out of litigation).  HTC is similarly situated to Motorola.  Both are large mobile device manufacturers that build Android handsets.  Both were approached by Immersion, in the same time frame, to discuss taking a license to the same Immersion technology.  And Motorola did eventually take a license to Immersion's technology, for which Motorola agreed to pay ████████████████

(Pampinella Decl. Ex. A, Pampinella Expert Report Report ¶ 71.)  The Motorola license was a

patent-only license that did not also include rights to Immersion's software product.  (*Id.*)  The

Motorola license included the patents-in-suit.  (*Id.*)  HTC's damages expert Ms. Stamm agrees

with Mr. Pampinella that the Motorola license "is informative to the hypothetical negotiation."

(Ex. A, Stamm Rebuttal Expert Report Report ¶ 77.)

      The portion of *LaserDynamics* that is relevant to HTC's Motion actually undermines

HTC's argument.  In determining whether expert testimony on a reasonable royalty rate should

have been excluded under Federal Rule of Evidence 702, the panel applied the standards

discussed in *Wordtech*, in which the Federal Circuit had "rejected the patentee's reliance on

eleven of the thirteen licenses for being in the form of a running royalty (whereas the patentee

had sought a lump sum payment)." *LaserDynamics*, 694 F.3d at 79-81 (discussing *Wordtech*

*Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320-21 (Fed. Cir. 2010)).  While

stopping short of an absolute rule against converting between lump sum payments and per-unit

royalties, the Court emphasized the need for "appropriate evidence and reasoning" to support

such an analysis.  694 F.3d at 81.  Here, neither HTC nor its expert provides ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

(Pampinella Decl. Ex. C, Pampinella Dep. Tr. at 63:24-64:3.)

      HTC also cites to this Court's earlier decision in *AVM Technologies, LLC v. Intel Corp.*,

927 F. Supp. 2d 139 (D. Del. 2013).  But that case involved an expert's analysis of "a single

settlement agreement on a different patent without any analysis of the settlement context." 927

F. Supp. 2d at 144.  Again, the parties here agree that the Motorola license provides an

appropriate basis from which to determine reasonable royalties. The Motorola license included the patents-in-suit. And unlike *AVM*, Mr. Pampinella considered every Immersion license that included the patents-in-suit with a relevant field of use restriction allowing use of the technology in a mobile phone or device, along with the underlying negotiations and the context in which those agreements were formed. (Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 64-71.) Mr. Pampinella also took into account the settlement context. (*Id.* ¶ 74; Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶¶ 27-30.)

As this Court has previously explained, its holding in *AVM* does not apply to a license that "includes the patents-in-suit," or to an expert analysis that "at least minimally connects the license in question to the patents-in-suit and rather than simply extract a royalty rate from the previous license, uses the license as only a single component of his entire analysis." *Inventio AG v. Thyssenkrupp Elevator Corp.*, No. 08-874-RGA, Mem. Order at 8 (Feb. 6, 2014) (Ex. C). These distinctions apply again to the matter before the Court.

Ultimately, HTC's arguments about the Motorola license amount to "disagreements . . . with the conclusions reached by [Mr. Pampinella] and the factual assumptions and considerations underlying those conclusions, not his methodology." *ActiveVideo Networks*, 694 F.3d at 1333. Such disagreements are an insufficient basis to exclude expert testimony as a matter of law, especially because the considerations underlying Mr. Pampinella's conclusions have ample support in the record. *Id.* Mr. Pampinella's testimony about the Motorola license is appropriate under *Daubert* and Federal Rule of Evidence 702.

## IV. RELIABLE EVIDENCE SHOWS THAT THE PATENTS-IN-SUIT ARE IMMERSION'S KEY PATENTS

HTC next suggests that it is improper for Mr. Pampinella to rely on Immersion employees – the people who know the patents the best – in formulating his opinions. Contrary to

the suggestions in HTC's Motion, an expert may base his opinion on any facts or data, whether or not they are admissible, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. As the Federal Circuit recently explained, Federal Rule of Evidence 703 "does not predicate admissibility on the source of the facts or data or, in particular, on whether the source is employed by either of the parties." *Apple*, 757 F.3d at 1321. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2011); *United States Fire Ins. Co. v. Kelman Bottles, LLC*, No. 11cv0891, 2014 U.S. Dist. LEXIS 109982, at *7 (W.D. Pa. Aug. 8, 2014) (quoting *Children's Broad. Corp.*, 357 F.3d at 865).

Moreover, courts commonly allow experts to form opinions based on interviews of persons with knowledge. *See Stevens v. Cessna Aircraft Co.*, 634 F. Supp. 137, 143 (E.D. Pa. 1986), *aff'd without opinion*, 806 F.2d 252 (3d Cir. 1986). Even though Federal Rule of Evidence 703 does not require the factual basis of an expert's opinion to be admissible, courts have "uniformly admitted" lay opinion testimony relating to the value of property. 4 Weinstein's Federal Evidence § 701.03. This is particularly the case where the lay testimony involves business asset value and comes from the owners or officers with day-to-day participation in the affairs of a business. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (cited approvingly in Advisory Committee Notes to the 2000 amendments to Federal Rule of Evidence 701); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222 (11th Cir. 2003).

Here, Mr. Pampinella's assessment of the importance of the patents-in-suit within Immersion's overall patent portfolio is based upon a review of Immersion's business records and public financial disclosures, as well as discussions with ████████████████████ ███████████████████████████████████████████████████ ███████ (*See, e.g.*, Pampinella Decl. Ex. A, Pampinella Expert Report at ¶¶ 78, 101.)

HTC's Motion disregards Mr. Pampinella's review of Immersion's business records and financial disclosures, instead claiming that ███████████████████████████ ███████████████████████████. (Motion at 4.)  This is untrue.  Mr. Pampinella's report lists thousands of the parties' business records as materials considered.  (Pampinella Decl. Ex. A, Pampinella Expert Report at Attachment B.)  From these materials, Mr. Pampinella specifically identifies licensing presentations given by Immersion to various potential licensees. (*Id.* ¶ 78.)  In each of these licensing presentations, as Mr. Pampinella explains, ██████████ ████████████████████████ (*Id.*; Ex. D, IMMR00085225-271 at 242-255, 263-265; Ex. E, IMMR00077490-527 at 495; Ex. F, IMMR00084080-141 at 081; Ex. G, IMMR00173614-621 at 616-617.)  In fact, Immersion's ████████ license to Samsung, which included the ██████████████████████████████████████████ ████████████████████ (Ex. H, IMMR00210880-901 at 885.)

Additionally, in Immersion's periodic financial disclosures, filed with the United States Securities and Exchange Commission and certified by its Chief Executive Officer and Chief Financial Officer, the patents-in-suit are characterized as some of Immersion's "key" patents. (Pampinella Decl. Ex. A, Pampinella Expert Report ¶ 78; Ex. I, Immersion Form 10-K for Period Ending December 31, 2013 at 14-15.) ███████████████████████████████████ ████████████████████████████ (*See* Pampinella Decl. Ex. C, Pampinella Dep. Tr. at

14:12-24.) 

" (Declaration of Victor ("Viegas

Decl.") Viegas Decl. ¶ 15.)

.[3]  (Id. ¶

10.)  For example,

(Id. ¶¶ 11-12.)

(Id. ¶ 13.)                                                                    .  (Id.)

 Mr. Pampinella based his opinions on Immersion business records not prepared in

connection with this litigation and on interviews with Immersion employees with personal

knowledge of Immersion's patent portfolio and licensing negotiations.  These are facts on which

an expert would "reasonably rely . . . in forming an opinion on the subject."  Fed. R. Evid. 703.

The *Oracle* orders cited by HTC do not stand for a contrary proposition.  The December 2011

order, in which Judge Alsup excluded portions of Oracle expert testimony, found that the expert

had opined "without any basis" and analogized to a case in which the expert acted based on his

---

[3]

(Pampinella

Decl. Ex. A, Pampinella Expert Report ¶ 74.)

"gut feeling." *Oracle Am. Inc. v. Google, Inc.*, No. C-10-03561 WHA, 2011 WL 6055505, at

*5-6 (N.D. Cal. Dec. 6, 2011) (citing *Medtronic, Inc. v. Boston Scientific Corp.*, No. 99-1035

(RHK/FLN), 2002 WL 34447587, at *11-12 (D. Minn. Aug. 8, 2002)). But Judge Alsup

subsequently allowed expert testimony on patent valuation that was based on a rankings analysis

performed by Oracle employees. *Oracle Am. Inc. v. Google, Inc.*, No. C-10-03561 WHA, 2012

WL 850705, at *2-4 (N.D. Cal. Mar. 13, 2012) (permitting expert to testify on the value of the

"top 22" Oracle patents).

Immersion's assessment of the patents-in-suit is even more reliable than the *Oracle*

approach, ███████████████████████████████████

███████████████████████. Thus, the Immersion valuation was performed to drive

Immersion's business and not conducted under color of litigation. Moreover, earlier this year,

the Federal Circuit again cautioned against district court judges "questioning the factual

underpinnings and correctness" of a reasonable royalty expert's testimony, rather than the

methodology applied. *Apple*, 757 F.3d at 1319.

Finally, Mr. Pampinella does not rely on "undisclosed" discussions. (*Compare* Motion at

5.) At his deposition, Mr. Pampinella provided HTC's counsel with complete answers to their

limited questions about his discussions with ████████████████. (*See, e.g.*, Pampinella

Decl. Ex. C, Pampinella Dep. Tr. at 13:23-23, 16:18-17:7, 32:3-14, 37:12-23.) To the extent that

HTC is suggesting that Immersion's employees provided Mr. Pampinella with biased versions of

the facts in their interviews, this is a question of weight and not admissibility, which HTC may

attempt to address on cross-examination and through its own experts. *Apple*, 757 F.3d at 1321.

## V.   MR. PAMPINELLA PROPERLY CONCLUDES THAT HTC'S INFRINGEMENT IS THE "BUT-FOR" CAUSE OF LOST PROFITS TO IMMERSION

The measure of statutory patent damages is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) (plurality opinion)).  Accordingly, courts "consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the 'but for world,' and accordingly to recover lost profits in a wide variety of forms." 185 F.3d at 1350.

The Federal Circuit has "affirmed lost profit awards based on a wide variety of reconstruction theories," so long as the hypothetical, but-for world is supported with sound economic proof. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013) (quoting *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001)), *cert. denied*, 134 S. Ct. 1013 (2014).  In constructing this world, "the patent holder does not need to negate all possibilities that a purchaser might have bought a different product or might have foregone the purchase altogether." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989) (quoting *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 21 (Fed. Cir. 1984)).

Mr. Pampinella constructs two alternative hypothetical, but-for worlds:  (1) Immersion's profits if HTC had not infringed by virtue of entering into a TouchSense agreement with Immersion (termed "HTC as Licensee"), and (2) Immersion's profits if HTC had not infringed because it left the market. (*See* Pampinella Decl. Ex. A, Pampinella Expert Report ¶ 24.)  As an initial matter, HTC's Motion takes issue with *only* the first of Mr. Pampinella's but-for worlds,

15

"HTC as Licensee." None of HTC's arguments apply to a world in which HTC left the market to avoid infringing. (*See* Motion at 9-12.) Therefore, there is no dispute that the jury can properly hear Mr. Pampinella's testimony that HTC's infringement caused Immersion to lose profits of between ███████████████ that it would have earned from other licensees if HTC had left the market rather than infringe. (*See* Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶¶ 67-68.)

### A.    There is Sufficient Evidence of Demand For the Immersion Product

HTC's Motion mistakenly contends that Mr. Pampinella's HTC as Licensee theory does not meet the *Panduit* factor[4] of demand for the "patented product." (Motion at 10-11.) To begin, HTC is incorrect that lost profits damages are available only for the "patented product." (*Id.* at 10.) As the Federal Circuit has explained, a patentee may recover *any* profits it would have received but for infringement, even for products not covered by the patents-in-suit. *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995) (awarding lost profits for lost sales of product that did not embody the patent-in-suit); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548-49 (Fed. Cir. 1995) (rejecting argument that "[patentee] cannot obtain damages consisting of lost profits on a product that is not the patented invention"); *see also Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (patentee can recover lost profits for "convoyed sales" in which patented and unpatented products are sold as a functional unit). Requiring patent owners to exploit the invention in order to recover lost profits "would force patent owners to accept a reasonable royalty in cases where a reasonable royalty is inadequate

---

[4] It bears noting that the *Panduit* factors are a "nonexclusive" test that courts should modify as appropriate to fit the realities of the case. *See State Indus.*, 883 F.2d at 1577. "If there are other ways to show that the infringement in fact caused the patentee's lost profits, there is no reason why another test should not be acceptable." *Rite-Hite Corp.*, 56 F.3d at 1548.

compensation.  Infringers would in effect receive the windfall of a retroactive compulsory license from the patent owner." *King Instruments*, 65 F.3d at 951.

Further, Mr. Pampinella *does* establish that demand existed for Immersion's product. "[T]he *Panduit* factors place no qualitative requirement on the level of demand necessary to show lost profits," nor do they require that the patentee have in fact sold any of its product during the demand period. *Versata Software*, 717 F.3d at 1265.  Here, reliable evidence shows that HTC ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(*See* Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 32-38; Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 55.)  For example, as Mr. Pampinella explains in his report,

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████  (Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 55.)  ████████████████████████████████████

████  (*Id.*; Ex. J, IM0047646-658.)  ████████████████████████████

████████████████████  (*Id*; Ex. K, HTC-IM-DEL0042946-953 at 946.)

HTC cannot dispute that its employees were involved in these negotiations, and it provides no authority for its contention that "demand" can come only from certain people within a corporation.  (*See* Motion at 11.)  Finally, HTC cannot rely on its decision to infringe Immersion's patents rather than taking a license as evidence that there was no demand.  (*See id.* at 10.)  In application, such a rule would allow anybody who was offered a license to avoid lost profits damages simply by rejecting the license and choosing infringement.

Immersion's licenses to other companies in HTC's market also confirm that there was demand for the Immersion product.  For example, Samsung has repeatedly licensed Immersion's TouchSense software along with Immersion intellectual property, most recently paying ███████████████████████ (Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 36-37.)  LG Electronics, Nokia, Pantech, and Fujitsu, among others, also took licenses to Immersion's TouchSense software and intellectual property.  (*Id.* ¶¶ 37-38.)  Moreover, HTC's Motion ignores the demand for product that is inherently generated by the Android OS standards that require haptic implementation for smartphones with actuators.  (*Id.* ¶ 33.)  There is ample evidence from which a reasonable jury could find demand for the Immersion product.

**B.      There is Sufficient Evidence of the Amount of Immersion's Lost Profits**

Mr. Pampinella's calculation of Immersion's lost profits is far from "speculative." (*Compare* Motion at 11.)  Even though all lost profits entail a "hypothetical" world, *see Versata Software*, 717 F.3d at 1265, Mr. Pampinella's calculation is based upon *real values* that were *actually exchanged* in negotiations between Immersion and HTC.  (Pampinella Decl. Ex. A, Pampinella Expert Report ¶¶ 43-51; Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 59.)  HTC's expert Ms. Stamm also conducted an analysis of offers between Immersion and HTC.  (Ex. A, Stamm Rebuttal Expert Report ¶¶ 267-74.)  As is the case throughout its Motion, HTC raises factual disagreements that it can pursue on cross-examination or through its own expert, but that are an insufficient basis to exclude Mr. Pampinella's testimony.  *See ActiveVideo Networks*, 694 F.3d at 1333.

**C.      HTC's Infringement Was the But-For Cause of Lost Profits to Immersion**

Contrary to HTC's argument, there is no requirement that the infringer and patentee could "have made one another's sales" in order for lost profits to apply.  (*See* Motion at 12.)  The only fundamental requirement for lost profits is the patentee showing a reasonable probability

18

that "'but for' the infringement, he would have made additional profits." *Grain Processing Corp.*, 185 F.3d at 1349 (quoting *King Instruments*, 65 F.3d at 952). Within this framework, "a wide variety of reconstruction theories" are appropriate. *Versata Software*, 717 F.3d at 1265 (quoting *Crystal Semiconductor Corp.*, 246 F.3d at 1355).

As Mr. Pampinella's reports explain, his "HTC as Licensee" lost profits analysis is based on the licensing revenue lost by Immersion, not the profits realized by HTC for selling its mobile phones:

> Rather, I use the number of mobile phones sold by HTC as the unit count upon which Immersion would have received royalty payments for use of its software and technology by HTC. In other words, Immersion is paid per-unit royalties by its licensees for its software and patents rights based on the number of phones those licensees sell, and these lost royalties are the basis for Immersion's damages claims related to its lost royalty income.

(Pampinella Decl. Ex. B, Pampinella Reply Expert Report ¶ 54.) Mr. Pampinella's opinion considers damages that were the "but-for" result of HTC's infringement and are therefore a legally proper basis for the recovery of lost profits. *Grain Processing Corp.*, 185 F.3d at 1349. Evaluating the correctness of Mr. Pampinella's conclusions as compared to those of Ms. Stamm is a task "solely reserved for the fact finder." *Apple*, 757 F.3d at 1314.

## VI.    CONCLUSION

For the aforementioned reasons, Immersion respectfully requests that the Court deny HTC's Motion in its entirety.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Bryan Wilson
Marc Peters
Michael Kryston
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA  94304
Tel:  (650) 813-5600

Harold J. McElhinny
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Tel:  (415) 268-7000

By:   */s/ Bindu A. Palapura*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

*Attorneys for Plaintiff Immersion Corporation*

Dated:  October 24, 2014
Public Version Dated: November 4, 2014
1170109 / 41933

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Bindu A. Palapura, hereby certify that on November 4, 2014, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on November 4, 2014, the attached document was electronically mailed to the following person(s)

John G. Day
Tiffany Geyer Lydon
Andrew C. Mayo
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P. O. Box 1150
Wilmington, DE 19899
jday@ashby-geddes.com
tlydon@ashby-geddes.com
amayo@ashby-geddes.com

Ryan J. McBrayer
Jonathan R. Putman
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
HTC-Immersion_Service@perkinscoie.com
jputman@perkinscoie.com

John P. Schnurer
Michael J. Engle
Ryan B. Hawkins
Perkins Coie LLP
11988 El Camino Real, Suite 200
San Diego, CA 92130
HTC-Immersion_Service@perkinscoie.com

Terrance J. Wikberg
Brandon M. White
Perkins Coie LLP
700 Thirteenth Street N.W.
Washington, DC 20005
HTC-Immersion_Service@perkinscoie.com

Cheng C. Ko
Perkins Coie LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
HTC-Immersion_Service@perkinscoie.com

By:  */s/ Bindu A. Palapura*
      Richard L. Horwitz
      David E. Moore
      Bindu A. Palapura
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com
      bpalapura@potteranderson.com

1167553 / 41933