IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IMMERSION CORPORATION,<br><br>        Plaintiff,<br>v.<br><br>HTC CORPORATION, and HTC<br>AMERICA, INC.<br><br>        Defendants. | Civil Action No. 12-259-RGA |

## MEMORANDUM OPINION

Richard L. Horwitz, Esq., David E. Moore, Esq., Bindu A. Palapura, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Bryan Wilson, Esq. (argued), Marc D. Peters, Esq., Michael J. Kryston, Esq., Daniel Hubin, Esq., Morrison & Foerster LLP, Palo Alto, CA; Harold J. McElhinny, Esq., Morrison & Foerster LLP, San Francisco, CA, attorneys for the Plaintiff.

John G. Day, Esq., Tiffany Geyer Lydon, Esq., Ashby & Geddes, Wilmington, DE; John P. Schnurer, Esq., Michael J. Engle, Esq., Ryan B. Hawkins, Esq., Perkins Coie LLP, San Diego, CA; Ryan McBrayer, Esq. (argued), Jonathan Putman, Esq., Perkins Coie LLP, Seattle, WA, attorneys for the Defendants.

February 24, 2015

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Presently before the Court is Defendants HTC Corporation and HTC America, Inc.'s Motion to Exclude the Testimony of James Pampinella. (D.I. 236). The issue has been fully briefed. (D.I. 237, 263, 278). The Court took testimony and held oral argument on January 30, 2015. (D.I. 329). For the reasons stated herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. The Court will exclude Mr. Pampinella's testimony with respect to lost profits and allow his testimony with respect to a reasonable royalty.

## BACKGROUND

Plaintiff Immersion Corporation filed a complaint on March 2, 2012 alleging that HTC Corporation, HTC (B.V.I.) Corporation, HTC America Holdings, Inc., HTC America, Inc., and Exedea, Inc. infringed U.S. Patent Nos. 6,429,846 ("the '846 patent"), 7,592,999 ("the '999 patent"), 7,969,288 ("the '288 patent"), 7,982,720 ("the '720 patent"), 8,031,181 ("the '181 patent"), and 8,059,105 ("the '105 patent"). (D.I. 1). The case was stayed on April 12, 2012 pending an International Trade Commission investigation. (D.I. 7). The case was reopened on May 1, 2013 and an amended complaint was filed against HTC Corporation and HTC America, Inc. (D.I. 11). The other defendants were terminated as parties. A second amended complaint was filed on June 10, 2013, which dropped the infringement allegations with respect to the '999 patent. (D.I. 28). Defendants responded to the second amended complaint on June 28, 2013. (D.I. 33). There are no counterclaims or cross-claims.

On February 11, 2015, the Court issued its Claim Construction Opinion (D.I. 332) and ruled on Defendants' motions for summary judgment (D.I. 334). The Court granted summary judgment of invalidity with respect to the '105, '181, and '720 patents and partial summary

2

judgment regarding the damages period for the '288 patent. (D.I. 334). The Court granted summary judgment that there was no literal infringement of the '105 and '846 patents. (*Id.*).

## LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." . . . By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (footnote and internal citations omitted).[1]

## ANALYSIS

**A. Reasonable Royalty**

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the recent amendments to it were not intended to make any substantive change.

3

Mr. Pampinella's reasonable royalty analysis is based primarily on a 2012 settlement agreement with Motorola. Mr. Pampinella considered several other relevant licenses, but determined that the Motorola license was the most probative because (1) it covers the same patents, (2) it was for the patents alone (and not related software), (3) the accused devices have the same operating system, (4) like Immersion and HTC, Immersion and Motorola do not have a historical licensing relationship, and (5) Motorola and HTC have comparable market shares. (D.I. 329 [hereinafter "Tr."] 16-19). The Motorola agreement provided for a $0.11 per-unit royalty on future sales and a $500,000 lump-sum settlement fee. (D.I. 264-1 at 35). The license covered Plaintiff's entire patent portfolio and contained a field-of-use restriction, so it effectively licensed 74 patents. (D.I. 263 at 17 n.3). As part of his analysis, Mr. Pampinella determined the value attributable to the patents-in-suit. (Tr. at 24-25). Defendants do not challenge the remaining steps of his calculation.

Defendants argue that Mr. Pampinella's reasonable royalty calculation is inadmissible for two reasons. First, Defendants contend that Mr. Pampinella's calculation rests on the premise that the patents-in-suit are the most valuable in the portfolio, but that Mr. Pampinella has no basis for that assertion. (D.I. 237 at 5). Second, Defendants accuse Mr. Pampinella of "cherry-picking." (*Id.* at 11). They argue that Mr. Pampinella cherry-picked the license with the highest royalty rate and ignored other relevant licenses. (*Id.*). Defendants contend that while Mr. Pampinella claims to have "considered" several other licenses, they did not factor into his calculation. (D.I. 278 at 9). Defendants further argue that Mr. Pampinella then cherry-picked the highest payment from within that license. (D.I. 237 at 11). Defendants maintain that the $500,000 settlement fee represents "an effective royalty rate" of $0.02 per unit for past sales.

4

(*Id.* at 6). They therefore argue that Mr. Pampinella arbitrarily picked the $0.11 rate over the $0.02 rate. (*Id.* at 11).

Plaintiff responds that Mr. Pampinella had a sound basis to believe that the patents-in-suit are the most valuable in the portfolio. (D.I. 263 at 14). Plaintiff notes that Mr. Pampinella's assessment is based on Immersion's business records, public financial disclosures, and interviews with employees familiar with the value of the patents. (*Id.* at 16-17). With respect to Defendants' cherry-picking argument, Plaintiff argues that Mr. Pampinella relied on the Motorola license because it was the most relevant to the situation. (*Id.* at 12-13). Moreover, Plaintiff argues that Defendants' own expert agreed that the license was informative. (*Id.* at 13). Plaintiff further argues that the $500,000 settlement fee was not a per-unit royalty for past sales. (*Id.* at 9). Mr. Pampinella therefore could not have cherry-picked the most favorable royalty from within that license because the license contained only one royalty. Immersion employees involved in the Motorola negotiations stated that the focus was on a future royalty, and the lump-sum payment was a peripheral issue. (*Id.* at 10). Plaintiff argues that the lump-sum payment was tied to a release related to Google's acquisition of Motorola, not the volume of past sales. (*Id.* at 11).

Defendants identify several issues that should be considered when evaluating Mr. Pampinella's testimony.[2] However, Defendants' "disagreements are with the conclusions reached by [Plaintiff's] expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the

---

[2] One of the issues was that the 74 patents were not identified. (Tr. at 106-07). The Court directed Plaintiff to identify them for Defendants. (*Id.* at 109). Since the Court has heard nothing further on the subject, the Court assumes Plaintiff did so.

5

testimony and not its admissibility." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

The Court is not persuaded that Mr. Pampinella arbitrarily cherry-picked the most favorable license to use as a starting point. Defendants' expert also used the Motorola license as a starting point. (Tr. 100-03). The two experts, however, analyzed the license differently. (*Id.*). The Court also finds that Mr. Pampinella provided support for why he found that the patents-in-suit are the most valuable in the portfolio and why the lump-sum payment does not affect the royalty in the Motorola license. Those assessments are not the unsupported speculation that Rule 702 guards against. It is the province of the jury to determine whether they find Mr. Pampinella credible and his analysis persuasive. Defendants' concerns are matters properly addressed on cross-examination. The Court will therefore not exclude Mr. Pampinella's reasonable royalty testimony.

## B. Lost Profits[3]

Mr. Pampinella's lost profits theory is based on a license agreement that the parties negotiated for several years, but ultimately did not enter into. (D.I. 264-1 at 15; Tr. 91-93). The agreement would have licensed the patents-in-suit, as well as Plaintiff's TouchSense[4] software at a $0.12 per-unit royalty rate. (D.I. 264-1 at 23). Mr. Pampinella reasoned that "but for" Defendants' infringement, Defendants would have entered into the agreement they had been negotiating. (*Id.* at 16). He therefore calculated lost profits by applying that rate to HTC's sales. (*Id.* at 24).

---

[3] Mr. Pampinella offered two lost profits theories. (D.I. 264-1 at 13). Defendants are challenging only the first. (D.I. 237 at 13 n.39).
[4] TouchSense is a software package that mobile device manufacturers can use to provide haptic feedback in their devices. (D.I. 237 at 14 n.40; Tr. at 42-43).

6

Defendants argue that Mr. Pampinella's theory is speculative because it relies on a single proposed license, which Defendants rejected. (D.I. 237 at 14). Defendants also argue that Mr. Pampinella failed to show demand for the patented product as required by *Panduit*.[5] They note that TouchSense is not a patented product.[6] (*Id.*). Defendants further argue that "lost profits are a legal impossibility" because they are only available where a patentee can show that it would have made the infringer's sales absent infringement. (*Id.* at 15-16). As a practical matter, Plaintiff could not have made that showing as it does not manufacture phones. (*Id.* at 16).

Plaintiff responds that lost profits can be based on a number of different theories, not just lost sales of the patented item. (D.I. 263 at 19). Plaintiff notes that the Federal Circuit allows recovery for lost sales of products that do not practice the patent-in-suit. (*Id.* at 20). Plaintiff maintains that lost profits are available for any revenue lost due to infringement. (*Id.* at 23). Plaintiff further argues that Mr. Pampinella has sufficiently demonstrated demand. (*Id.* at 21). His expert report disclosed that Defendants had been incorporating haptic technology into their devices for several years, and engaged in "extensive discussions" with Plaintiff regarding TouchSense. (*Id.*). Plaintiff also maintains that its licenses to other mobile device manufacturers demonstrate demand. (*Id.* at 22). In addition, Plaintiff argues that Mr. Pampinella's theory is not speculative because it is based on values exchanged during actual negotiations between the parties. (*Id.*).

The Court finds that Mr. Pampinella's lost profits analysis is based on a faulty legal premise and will therefore exclude his lost profits testimony. A "patent owner who has suffered

---

[5] *Panduit Corp. v. Stahlin Bros. Fibre Works* lists four factors that a patentee must show to be entitled to lost profits: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) [its] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [it] would have made." 575 F.2d 1152, 1156 (6th Cir. 1978).

[6] There is no dispute on this point. (D.I. 278 at 13).

7

lost profits is entitled to lost profits damages regardless of whether the patent owner has made, used, or sold the patented device." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995). The fact that Plaintiff does not manufacture phones is therefore inapposite to the lost profits analysis. That does not mean, however, that recovery can be based on revenue lost from any product related to the patents-in-suit. To recover for lost sales of unpatented components sold with a patented product, "[a]ll the components together must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995) (en banc). The Federal Circuit held, "Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage. We are not persuaded that we should extend that liability." *Id.*

"A functional relationship does not exist when independently operating patented and unpatented products are purchased as a package solely because of customer demand." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008). If they can function independently, patented and unpatented products do not constitute a functional unit. *Rite-Hite Corp.*, 56 F.3d at 1551. Mr. Pampinella has neither shown nor attempted to show that TouchSense and the patented products have a functional relationship. The patented products are haptic feedback devices ('846 patent) and the haptic system that provides force feedback ('288 patent). TouchSense is a software package that mobile device manufacturers can use to incorporate haptic feedback in their devices. TouchSense, however, is not the only means of implementing haptic effects. It is undisputed that Motorola, whose license features so prominently in the reasonable royalty analysis, did not purchase TouchSense. (Tr. 19).

8

Products do not have a functional relationship merely because they are usually sold together. As a software package, TouchSense does not and cannot practice the patents. Though TouchSense is related to the patented products, the products can function independently of TouchSense. They are thus not a functional unit.

The Court therefore finds that Mr. Pampinella's method for calculating lost profits is based on a non-viable lost profits legal theory. The lost royalty revenue comes from unpatented software that does not have a functional relationship with the patents. Under *Rite-Hite*, the fact that the patent license and the software license were being negotiated in a single contract is insufficient to base lost profits on revenue that would have been derived from the software.

There is a second reason why the Court will exclude Mr. Pampinella's lost profits testimony: It is inconsistent with the premise of the lost profits analysis. The premise is that the infringer (here, HTC) had not infringed. *See, e.g., Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013) (holding that lost profits may be proved based on a hypothetical world "where infringement has been 'factored out of the economic picture'"). The case law is all based on an analysis where the hypothetical world is one in which the infringing sales did not occur. Since the sales did not occur, the infringement had been "factored out." Mr. Pampinella's hypothetical world is one in which the sales did occur, but HTC had licensed the patents. In that sense, Mr. Pampinella also "factored out" infringement. Counsel for Plaintiff candidly conceded that there is no case accepting this sort of lost profits analysis.[7] (Tr. 93-95).

Mr. Pampinella's opinion goes too far. It is based on the premise that "but for" the decision not to license the patents, Defendants would also have licensed the TouchSense software. Therefore, whatever profits would have been made if Defendants licensed the software

---

[7] To be fair, there is also no case rejecting this sort of lost profits analysis.

9

are recoverable. There would be no reason to stop with royalties paid by Defendants, however. If the U.S. government were poised to license TouchSense should HTC do so, because it wanted to have the software that dominated the market, are the royalties Immersion would have received from the government part of Plaintiff's lost profits?

In *King Instruments v. Perego*, the Federal Circuit noted that the patent "damages section, section 284, protects the right to exclude, not the right to exploit." 65 F.3d 941, 949 (Fed. Cir. 1995). The traditional lost profits analysis follows that principle—what would have happened if the infringer had not violated the patentee's right to exclude? The traditional lost profits damages analysis then flows from the hypothetical situation where the infringer was excluded. Mr. Pampinella's lost profits damages analysis does not begin with that starting point. His lost profits analysis, in essence, begins with the infringer taking a license, and then asks, what else would the infringer have bought from the patent holder? In my opinion, Mr. Pampinella's lost profits damages analysis is not a viable theory.[8]

In light of the above, it is not necessary to address Defendants' other lost profits arguments.

## CONCLUSION

For the reasons stated herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. The Court will exclude Mr. Pampinella's testimony with respect to lost profits and allow his testimony with respect to a reasonable royalty.

---

[8] Which is not to say that sales of TouchSense are irrelevant. The relevance, however, seems like a consideration as *Georgia-Pacific* factor #6 ("the existing value of the invention to the licensor as a generator of sales of [its] non-patented items; and the extent of such derivative or convoyed sales") in a reasonable royalty analysis. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

10